1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10

| | |
|---|---|
| SAY SULIN KEODARA, | CASE NO. 3:21-cv-5129 TMC-TLF |
| Plaintiff, | ORDER ON REPORT AND RECOMMENDATION |
| v. | |
| JERI BOE and ROBERT HERZOG, | |
| Defendants. | |

16        This matter comes before the Court on the Report and Recommendation of U.S.

17  Magistrate Judge Theresa L. Fricke.  Dkt. 66.  The Court has considered the Report and

18  Recommendation, objections, and responses to the objections and the remaining file.  It is fully

19  advised.

20        On March 9, 2021, Plaintiff Say Keodara, a *pro se* prisoner, filed this case alleging that

21  Defendants Jeri Boe and Robert Herzog violated his federal civil rights when they restricted his

22  ability to have contact with or marry Melissa Mesa, a woman he maintains is his fiancée.  Dkt. 8.

23  He alleges that Ms. Mesa was not connected to the prison drug smuggling ring for which he was

24

1    sanctioned.  *Id.*  He contends Defendants retaliated against him for filing prison grievances.  *Id.*

2    He asserts claims under the First Amendment, the Fourteenth Amendment, and the Eighth

3    Amendment.  *Id.*  He seeks declaratory and injunctive relief as well as damages.  *Id.*

4         On February 4, 2022, Defendants Boe (the Superintendent of Clallam Bay Corrections

5    Center ("CBCC"), the prison where Mr. Keodara is housed) and Herzog (Washington's Assistant

6    Secretary for Prisons) filed a motion for summary judgment with supporting declarations.  Dkts.

7    25–27.  Later, on Defendants' Motion, the Court sealed their initial motion for summary

8    judgment and supporting declarations (*id.*) and those pleadings were not considered. Dkt. 58.

9    Defendants were permitted to refile their Motion and supporting pleadings.  *Id.*  Defendants did

10   so.  Dkts. 60–64.  The Court granted Mr. Keodara an extension of time to respond (*see* Dkt. 66),

11   which he did, and he cross-moved for summary judgment.  Dkt. 50.  Defendants filed a reply

12   (Dkt. 44) and supplemental reply (Dkt. 53).

13        On September 15, 2022, the Report and Recommendation was filed.  Dkt. 66.  It

14   recommends granting Defendants' Motion for Summary Judgment (Dkt. 60), in part, and

15   dismissing all of Mr. Keodara's claims for damages.  *Id.*  The Report and Recommendation

16   recommends denying Defendants' Motion on Mr. Keodara's request for declaratory and

17   injunctive relief as to his First Amendment retaliation and Fourteenth Amendment substantive

18   due process right to marry claims against Defendant Boe.  *Id.*  It recommends finding that

19   Mr. Keodara is not entitled to a jury trial on these two remaining claims and that he should be

20   given a bench trial on them.  *Id.*  All parties filed objections to the Report and Recommendation.

21   Dkts. 68 and 75.  Defendants filed a response to Mr. Keodara's objections.  Dkt. 76.  The case

22   was reassigned to the undersigned on August 31, 2023.  The Report and Recommendation

23   (Dkt. 66) is ready for decision.

24

1
2
3
4
5

The Court adopts the Report and Recommendation in part and rejects it in part.  Because Mr. Keodara has failed to put forth evidence creating genuine issues of fact, Defendants are entitled to summary judgment dismissal of all his claims as a matter of law.  Defendants' Motion for Summary Judgment (Dkt. 60) is granted, Mr. Keodara's Motion for Summary Judgment (Dkt. 50) is denied, and the case is dismissed.

6

## I.     FACTS

7
8
9

Since 2013, Mr. Keodara has been serving a prison sentence for first degree murder and three first degree assault convictions. Dkt. 61 at 5.  At the time of these events, he was incarcerated at CBCC.  *Id.*

10
11
12
13
14

In April 2020, CBCC's investigative unit received confidential information that inmates, persons in the community, and a prison staff member were buying and selling drugs in the community and buying, selling, and smuggling drugs into CBCC.  Dkt. 61 at 5.  The Federal Bureau of Investigation ("FBI") and Olympic Peninsula Narcotics Enforcement Team ("OPNET") joined CBCC in the investigation.  *Id.*

15
16
17
18
19
20
21
22

According to Superintendent Boe and the CBCC's primary investigator Conrad Artis, through review of confidential information, phone calls, JPay messages[1], JPay pictures, and JPay videos, Mr. Keodara was identified as a "key member" of the drug operation.  Dkts. 61 at 6 and 63 at 2.  Melissa Mesa, Mr. Keodara's alleged girlfriend/fiancée, was identified as the primary person in the community responsible for buying and selling the drugs.  *Id.*  Mesa was a U.S. Customs and Border Patrol agent.  *Id.*  Investigator Artis indicated that in coming to these conclusions about Mr. Keodara and Mesa, he reviewed hundreds of phone calls between the two of them, as well as calls between Mr. Keodara and other individuals where Mr. Keodara

23
24

[1] JPay is the prison's electronic messaging system.  Dkt. 61 at 2.

ORDER ON REPORT AND RECOMMENDATION - 3

1   discussed Mesa.  Dkt. 63 at 2.  Superintendent Boe determined that Mesa's position as a federal

2   law enforcement officer posed "an even greater risk to security of the facility."  Dkt. 61 at 6.

3   Other community members were also identified as working with Mr. Keodara in the drug

4   operation.  Dkt. 61 at 6.

5          The investigation continued.  Dkt. 63 at 3.  According to Investigator Artis, at the

6   beginning of May 2020, the investigative team confirmed an incident where Mr. Keodara

7   coordinated with Mesa and another community member to allow Mesa to purchase drugs, which

8   she did.  *Id.*  She then dropped them off and they were smuggled into CBCC.  *Id.*

9          Investigator Artis states that by the end of May 2020, Mr. Keodara informed Mesa that

10  she would be handling his money and drug operation.  Dkt. 63 at 3.  Mr. Keodara gave Mesa's

11  phone number to other offenders and people in the community so they could contact her about

12  other transactions.  *Id.*  By July 2020, Mesa had multiple phones, phone numbers, and CashApp

13  accounts.  *Id.*  According to Investigator Artis, Mr. Keodara and Mesa discussed the rising price

14  of drugs and the use of various money transferring services.  *Id.*

15         On August 10, 2020, Investigator Artis overheard two telephone conversations between

16  Mr. Keodara and two other community members (Jania Smith and Dino Nguyen) about buying,

17  selling, and smuggling a specific shipment of drugs into the CBCC using a prison correctional

18  officer.  *See* Dkt. 63-1 at 2–3.  (Except for legal calls, certain CBCC staff are permitted to

19  monitor prisoner calls.  Dkt. 61-3 at 9.) On August 18, 2020, a prison correctional officer

20  admitted his involvement in the drug operation.  Dkt. 63 at 3.  The officer was arrested, and the

21  inmates involved in the operation (including Mr. Keodara) were transferred to the Intensive

22  Management Unit.  *Id.*

23

24

1    Superintendent Boe states that CBCC's actions were coordinated with outside agencies

2    "so as not to jeopardize the other agencies' investigations." Dkt. 61 at 9.  Accordingly, the

3    timing of CBCC's actions, like movement of offenders and sanctions, was in part determined by

4    the other agencies' (the FBI's or OPNET's) needs.  *Id.*

5    According to Mr. Keodara, on August 18, 2020, the CBCC's head investigator

6    interviewed him and asked for names of the corrections officers involved in the drug smuggling

7    ring. Dkt. 51 at 6.  Mr. Keodara denied knowing any information.  *Id.*  Mr. Keodara states that

8    the investigator told him he "would give him time to think about it."  *Id.*

9    Soon thereafter, an FBI agent informed Investigator Artis that Mr. Keodara and Mesa

10   were calling each other frequently using other offenders' PIN[2] numbers and Mesa had several

11   phones and phone numbers to make and receive calls. Dkt. 63 at 4.  The FBI requested that all

12   numbers associated with Mesa be blocked, which CBCC did.  *Id.*

13   The investigator returned to interview Mr. Keodara. Dkt. 51 at 6.  Mr. Keodara declined.

14   *Id.*  On August 29, 2020, he filed a grievance complaining that his phone PIN was shut off.

15   Dkt. 63-2 at 2.  He asserted in the grievance that the action was taken because he refused to be

16   interviewed.  *Id.*

17   The grievance counselor reached out to Investigator Artis, who in turn contacted the FBI.

18   Dkt. 63 at 4.  The FBI said the block on numbers associated with Mesa could be lifted, and Artis

19   lifted it by September 16, 2020.  *Id.*

20   On September 17, Mr. Keodara received a serious infraction under Washington

21   Administrative Code 603 for bringing or attempting to bring drugs into the facility based on his

22

23   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [2] PIN numbers are "personal identification numbers" which offenders must use to make calls.
24   Dkt. 61 at 3.  Offenders are responsible for all calls made with their PINs.  *Id.*

interactions with Jania Smith and Dino Nguyen. Dkt. 63-1 at 2–4. His interactions with Mesa were not listed as grounds for the infraction. *Id.*

According to CBCC Investigator Artis, shortly after he lifted the phone number block, the FBI again asked that all numbers associated with Mesa be blocked. Dkt. 63 at 4. The FBI contended that Mr. Keodara and Mesa were impeding their criminal investigation. *Id.* The CBCC blocked all numbers associated with Mesa. *Id.*

On October 5, 2020, Mr. Keodara filed another grievance complaining that his PIN had been restricted again to call "certain family" "for no reason." Dkt. 63-3 at 2. After consulting the FBI, by October 22, 2020, CBCC again lifted the block on numbers associated with Mesa. Dkt. 63 at 5.

Mr. Keodara received a hearing on his infraction on October 28, 2020. Dkt. 63-1 at 5–50. He was present, and both sides presented evidence and questioned witnesses. *Id.* CBCC also considered confidential information. *Id.* Mr. Keodara was found guilty. *Id.* As part of his sanction, he was forbidden from having contact with Jania Smith and Dino Nguyen. *Id.* Mr. Keodara did not appeal the infraction. Dkt. 61 at 7.

On November 4, 2020, Superintendent Boe permanently terminated Mesa's visitation and communication privileges with all offenders at CBCC. Dkt. 61 at 7. As grounds for her action in the termination letter, Superintendent Boe pointed out that "in May 2020 it is believed that [Mesa], in concert and at the direction of incarcerated individual Keodara, assisted, aided and/or conspired to introduce contraband into CBCC." Dkt. 61-9 at 2. Although it was not in the termination letter, Superintendent Boe states that her "decision was based on the extensive evidence [she] was provided from [CBCC's investigative unit] and the FBI which showed that Mesa was the primary person Keodara communicated with for his money and drug activity."

1   Dkt. 61 at 7.  She further noted that Mesa was a federal law enforcement officer with U.S.

2   Customs and Border Patrol, and she believed "Mesa's position as a federal law enforcement

3   officer, her behavior, and her criminal activity makes her a risk to the safety and security of the

4   prison." *Id.*

5          CBCC sent Mr. Keodara a copy of the termination letter.  Dkt. 61-9 at 2.  Mesa was

6   informed that she could appeal the decision regarding visitation but not the decision regarding

7   communication to the Assistant Secretary of Prisons (Dkt. 61-9 at 2), which Mesa did (Dkt. 61-

8   10).  In her appeal to Assistant Secretary of Prisons Herzog, Mesa denied any wrongdoing and

9   insisted she did not know the basis for the allegations.  Dkt. 61-10.  "Based on records review,

10  due to safety and security concerns," Hertzog denied her appeal on December 14, 2020.  Dkt. 61-

11  11.

12         Superintendent Boe denies knowing about Mr. Keodara's two grievances (regarding his

13  PIN being turned off) before she permanently terminated Mesa's communication and visitation

14  privileges with the facility.  Dkt. 61 at 8.

15         In March 2021, CBCC investigators and the FBI executed a warrant on Mesa's residence.

16  Dkt. 61 at 8.  According to CBCC Investigator Artis, whose unit assisted in executing the

17  warrant, they found evidence of Mesa's role not only in buying, selling, and smuggling drugs

18  into CBCC, but also into other prisons.  Dkt. 63 at 5.  Superintendent Boe learned of the

19  evidence found through the warrant.  Dkt. 61 at 8.  Further investigation into the activities of

20  Jania Smith resulted in CBCC permanently terminating Ms. Smith's communication privileges

21  with CBCC as well.  Dkt. 63 at 5.

22         In August 2021, several months after this case was filed, the CBCC discovered that

23  Mr. Keodara and Mesa were circumventing the permanent communication restriction.  Dkt. 61 at

24

9. On August 2, 2021, Mr. Keodara received an infraction for violation of WAC 718 – "using the mail telephone or electronic communications in violation of any law, court order or previous written warning, direction and/or documented disciplinary action." Dkt. 63-2. He was found guilty. *Id.* According to Superintendent Boe, Mr. Keodara and Mesa "continue to find ways around the communication restrictions. Mesa uses new phone numbers, new emails, and new user accounts to contact Keodara and other offenders" at CBCC. *Id.*

## II.     DISCUSSION

This Court reviews the Report and Recommendation de novo. 28 U.S.C. § 636(b)(1)(C). The standard for summary judgment is in the Report and Recommendation (Dkt. 66 at 2–3) and is adopted here. The Court will address the parties' objections by claim.

### A.     First Amendment Retaliation Claim – Defendants' Objections

The Report and Recommendation properly states the test for a First Amendment retaliation claim in the context of a prison: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Dkt. 66 at 8 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005)).

The Report and Recommendation recommends finding issues of fact regarding the fifth element: that the decision to restrict Mesa from communicating or visiting the CBCC (including with Mr. Keodara) did not reasonably "advance legitimate correctional goals" but was in retaliation for Mr. Keodara having filed two grievances. Dkt. 66 at 8. The Report and Recommendation points to the following statement in Mr. Keodara's Declaration: "Ms. Mesa never brought drugs into CBCC or any other DOC facility nor did I ever direct her to." *Id.* (*citing*

1  Dkt. 51 at 4).  Mr. Keodara reasons that if Mesa was not involved in the drug ring, restricting his

2  access to her could not have furthered penological goals and was only done in retaliation for his

3  grievances.  *Id.*

4     Defendants persuasively object that Mr. Keodara does not have personal knowledge to

5  support his sweeping statement that "Mesa never brought drugs into the CBCC or any other

6  DOC facility."  It is a conclusory allegation unsupported by personal knowledge and not

7  admissible in court.  Fed. R. Ev. 602; Fed. R. Ev. 802.  Mr. Keodara has been incarcerated since

8  2013.  Although he can attest to his own communications with Mesa, he has no personal

9  knowledge of her conduct in the community or interactions with others, and his assertion cannot

10  create a genuine dispute with the abundant evidence submitted by Defendants of Mesa's drug

11  smuggling activity.  A "self-serving declaration that states only conclusions and not facts that

12  would be admissible evidence" is insufficient to create a genuine factual dispute. *Nigro v. Sears,*

13  *Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

14     The Court therefore declines to adopt this portion of the Report and Recommendation.

15  Mr. Keodara has failed to present competent evidence to support the fifth element of his

16  retaliation claim—that the decision to ban Mesa from communicating with people at or visiting

17  CBCC "did not reasonably advance a legitimate correctional goal."  *Rhodes* at 568.  He has the

18  burden to do so.  *Pratt v. Rowland,* 65 F.3d 802, 808 (9th Cir. 1995).

19     Defendants, in contrast, offer ample evidence that termination of Mesa's communication

20  and visitation privileges advanced the legitimate correctional goals of keeping the facility safe

21  and reducing the presence of illegal drugs.  Defendants had significant evidence that Mesa (once

22  a federal law enforcement officer) was a key player in a prison drug smuggling ring.

23  Superintendent Boe's decision to ban Mesa from access to CBCC was reasonably calculated to

24

1   reduce the likelihood that more illegal drugs would enter the facility.  "[S]ubstantial deference"

2   is accorded to the professional judgment of prison administrators, "who bear a significant

3   responsibility for defining the legitimate goals of a correctional system and for determining the

4   most appropriate means to accomplish them." *Griffin v. Gomez*, 741 F.3d 10, 20 (9th Cir. 2014).

5   They must be "free to take appropriate action to ensure the safety of inmates and corrections

6   personnel." *Id.* at 21.

7          Defendants also persuasively object that Mr. Keodara has failed to point to issues of fact

8   regarding the second element of his retaliation claim—the "because of" or motive element.  This

9   issue was not discussed in the Report and Recommendation.

10          A plaintiff creates a genuine issue of material fact on the question of retaliatory motive

11   when they produce, in addition to evidence that the defendant knew of the protected speech, at

12   least "(1) evidence of proximity in time between the protected speech and the allegedly

13   retaliatory decision, (2) evidence that the defendant expressed opposition to the speech or

14   (3) evidence that the defendant's proffered reason for the adverse action was false or pretextual."

15   *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009).

16          Mr. Keodara has offered no evidence of Superintendent Boe's alleged retaliatory intent

17   beyond the timeline of events.  While timing can be "circumstantial evidence of retaliatory

18   intent," it is not enough when "there is little else to support the inference" and "insufficient

19   evidence" that prison officials "were actually aware" of the protected speech.  *Pratt*, 65 F.3d at

20   808.  Superintendent Boe denies knowing of Mr. Keodara's grievances before she terminated

21   Mesa's communication and visitation privileges.  Mr. Keodara offers no evidence that

22   Superintendent Boe knew of his grievances before she acted.  "[M]ere speculation that

23

24

1  defendants acted out of retaliation is not sufficient." *Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir.

2  2014).  Mr. Keodara has failed to establish issues of fact on the second element of his claim.

3  Even *pro se* parties, whose pleadings are liberally construed, must identify some

4  competent evidence to support their claim.  *Soto v. Sweetman,* 882 F.3d 865, 872 (9th Cir. 2018).

5  Mr. Keodara has failed to do so on at least two elements of his First Amendment retaliation

6  claim.  The Court will dismiss this claim with prejudice.

7  **B.      Substantive Due Process Right to Marry Claim – Defendants' Objections**

8  "Prison walls do not form a barrier separating prison inmates from the protections of the

9  Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987).  At the same time, prisoners retain only

10  those rights that are not inconsistent with their status as prisoners or "with the legitimate

11  penological objectives of the corrections system." *Gerber v. Hickman*, 291 F.3d 617, 620 (9th

12  Cir. 2002) (cleaned up).  The Fourteenth Amendment's due process clause protects a prisoner's

13  right to marry, but, like many other rights, it "is subject to substantial restrictions as a result of

14  incarceration." *Turner*, 482 U.S. at 95.  *Turner* requires that a restriction on a prisoner's right to

15  marry be "reasonably related" to a legitimate penological interest.  *Turner* at 96–97.  In *Turner,*

16  the Supreme Court considered the constitutionality of a regulation prohibiting inmate marriages

17  unless the superintendent found compelling reasons to allow the marriage.  While *Turner* held

18  that regulation swept too broadly, the Court nonetheless recognized that "legitimate security

19  concerns may require placing reasonable restrictions upon an inmate's right to marry and may

20  justify requiring the approval of the superintendent." *Id.* at 97.

21  Here, Mr. Keodara may not marry Mesa because she is banned from CBCC, and DOC

22  policy allows inmate marriages only to individuals on the inmate's approved visitor list, unless

23  the Assistant Secretary for Prisons grants an exception. *See* Dkt. 61 at 5; Dkt. 51 at 37. The

24

1   Report and Recommendation urges finding questions of fact with Defendants' proffered basis for

2   banning Mesa from the facility—that is, whether the decision was reasonably related to

3   legitimate penological objectives.  Dkt. 66 at 11.  It again points to the Mr. Keodara's statement

4   that Mesa was not involved in the drug ring.  *Id.*

5          The Court declines to adopt the Report and Recommendation regarding Mr. Keodara's

6   Fourteenth Amendment right to marry.  As stated above, Mr. Keodara does not have personal

7   knowledge of Mesa's conduct in the community and his statements are not sufficient to

8   genuinely dispute the evidence of her involvement in trafficking drugs into CBCC and other

9   DOC facilities. Given that evidence, and her position as a former federal law enforcement

10  officer, Mesa's permanent exclusion from CBCC was "reasonably related" and not "an

11  exaggerated response" to the prison's legitimate security objectives in keeping illegal drugs out

12  of the CBCC.  *Turner*, 482 U.S. at 97–98.  While her exclusion results in an infringement on Mr.

13  Keodara's right to marry her, that restriction is consistent with the prison's legitimate security

14  concerns.  The Court dismisses Mr. Keodara's Fourteenth Amendment right to marry claim.

15         **C.      Fourteenth Amendment Procedural Due Process Claim – Plaintiff's
                      Objections**

16

17         The Court adopts the Report and Recommendation's recommendation that Mr. Keodara's

18  procedural due process claim be dismissed.  In his objections, Mr. Keodara points out that "the

19  Department categorizes the termination of visitation with a specified individual as a serious

20  violation sanction."  Dkt. 75 at 3.  He asserts that Mesa's exclusion from communicating or

21  visiting anyone at the prison functions as a sanction against him.  *Id*.  He notes that after he and

22  Mesa were caught violating Superintendent Boe's communication ban, he was sanctioned.  *Id*.

23         Procedural due process claims require analysis of two steps: (1) whether there exists a

24  liberty or property interest with which the State has interfered, and if so (2) "whether the

ORDER ON REPORT AND RECOMMENDATION - 12

procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). As to the first step, a protected liberty interest "may arise from two sources—the Due Process Clause itself and the laws of the States." *Id.*

Mr. Keodara's claim fails at the first step. He has failed to show that Defendants infringed on a protected liberty interest when they terminated Mesa's visitation and communication privileges at CBCC. The Constitution does not guarantee prisoners the right to contact visits, *Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002), or communication with a particular visitor, *Keenan v. Hall,* 83 F.3d 1083, 1092 (9th Cir. 1996).

Further, to the extent Mr. Keodara turns to the prison's regulations as a source of a protected liberty, courts now do not examine the language of the regulations. *Mitchell v. Dupnik*, 75 F.3d 517, 522 (9th Cir. 1996) (citing *Sandin v. Conner*, 515 U.S. 472 (1995)). Instead, courts consider "the hardship caused by the prison's challenged action relative to the basic conditions of life as a prisoner." *Id.* (internal quotation marks and citation omitted). As the Report and Recommendation notes (Dkt. 66 at 12), a liberty interest in the prison context includes only "freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Mitchell*, 75 F.3d at 522 (quoting *Sandin*, 515 U.S. at 484).

Mr. Keodara's assertion that he has a liberty interest in communication or visitation with Mesa is unavailing. He has not shown that restraint from visiting or communicating with her is an "atypical and significant hardship" considering his incarceration and Ms. Mesa's conduct. CBCC regulations provide several grounds by which DOC may exclude an individual from visiting or communicating with a prisoner. For example, Washington State DOC Policy 450.300 IX.B, "Denial, Suspension or Termination of Visits" provides that persons involved in

1  "attempting/conspiring to introduce . . . contraband will have their visit privileges suspended or

2  permanently terminated." Dkt. 61-5 at 11. Mr. Keodara fails to demonstrate that application of

3  this policy was a relative hardship. The Court will dismiss his claim for violation of his

4  Fourteenth Amendment procedural due process rights.

5          **D.**      **Fourteenth Amendment Equal Protection Claim—Plaintiff's Objections**

6          The Court adopts the Report and Recommendation's decision that Mr. Keodara's equal

7  protection claim should be dismissed. In his objections, Mr. Keodara indicates he is asserting a

8  "class of one" equal protection claim. Dkt. 75 at 8. He contends he had a right to procedural due

9  process, which he maintains is non-discretionary, and that other similarly situated offenders (who

10  were accused of some violation) were given that process and he was not. *Id.* at 8–9.

11          To maintain a claim for class-of-one equal protection, Mr. Keodara must show he has

12  been "(1) intentionally (2) treated differently from others similarly situated and that (3) there is

13  no rational basis for the difference in treatment." *SmileDirectClub, LLC v. Tippins*, 31 F.4th

14  1110, 1122–23 (9th Cir. 2022) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564

15  (2000) (per curiam)).

16          As stated in the Report and Recommendation, Mr. Keodara has failed to point to issues of

17  fact on this claim. He has not demonstrated that he was intentionally treated differently from

18  others similarly situated. Although the record contains statements from various prisoners

19  regarding their contacts with people outside the prison (including Mesa) and the CBCC's alleged

20  response, Mr. Keodara has not demonstrated these offenders were similarly situated. Nor has he

21  shown there was "no rational basis for the difference in treatment," given the evidence of his and

22  Mesa's involvement in drug smuggling discussed above. *Id.*

23

24

Moreover, "the class-of-one doctrine does not apply to forms of state action that 'by their nature involve discretionary decision-making based on a vast array of subjective, individualized assessments.'" *Towery v. Brewer*, 672 F.3d 650, 660 (9th Cir. 2012) (quoting *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 603 (2008)). The decision to exclude an individual from communication or visitation at a prison is, at its core, a discretionary decision by a prison administrator based on subjective assessment. Mr. Keodara fails to point to evidence that Superintendent Boe used her discretion in a pattern regarding all other offenders but treated him differently. "Absent any pattern of generally exercising the discretion in a particular manner while treating one individual differently *and* detrimentally, there is no basis for Equal Protection scrutiny under the class-of-one theory." *Towery*, 672 F.3d at 660–61. The Court will adopt the Report and Recommendation on this point and dismiss Mr. Keodara's equal protection claim.

### E. Eighth Amendment Claim—No Objections

The Court adopts the Report and Recommendation with respect to dismissal of Mr. Keodara's Eighth Amendment claim. Mr. Keodara did not meaningfully object to this portion of the Report and Recommendation.

### F. Qualified Immunity—Plaintiff's Objections

The Report and Recommendation recommends granting Defendants qualified immunity for Mr. Keodara's damages claims. Because the Court concludes Mr. Keodara has not put forth evidence showing a violation of his constitutional rights, the Court need not address qualified immunity. *Pearson v. Callahan*, 555 U.S. 223 (2009).

### G.     Plaintiff's Remaining Objection

Mr. Keodara's remaining objection, that he is entitled to a jury trial on his claim for declaratory and injunctive relief, is without merit as stated in the Report and Recommendation. Moreover, each of his claims should be dismissed with prejudice.

## III.     CONCLUSION

The Court declines to adopt the Report and Recommendation (Dkt. 66) as to Mr. Keodara's First Amendment retaliation and Fourteenth Amendment substantive due process right to marry claims and instead dismisses those claims.  The Court adopts the Report and Recommendation as to dismissal of the remaining claims. Defendants' Motion for Summary Judgment (Dkt. 60) is granted and Mr. Keodara's Motion for Summary Judgment (Dkt. 50) is denied.  Mr. Keodara's claims will be dismissed with prejudice and this case closed.

## IV.     ORDER

It is **ORDERED** that:

- The Report and Recommendation (Dkt. 66) **IS**:
  - **NOT ADOPTED** as to Plaintiff's First Amendment retaliation and Fourteenth Amendment substantive due process right to marry claims;
  - **ADOPTED** as to the dismissal of Plaintiff's remaining claims;
- Defendants' Motion for Summary Judgment (Dkt. 60) **IS GRANTED**;
- Plaintiff's Motion for Summary Judgment (Dkt. 50) **IS DENIED**;
- All Plaintiff's claims **ARE DISMISSED WITH PREJUDICE**; and
- This case **IS CLOSED**.
- Plaintiff's IFP status should continue if he chooses to appeal.

The Clerk is directed to send uncertified copies of this Order to Judge Theresa L. Fricke, all counsel of record, and to any party appearing *pro se* at said party's last known address.

Dated this 29th day of September, 2023.

Tiffany M. Cartwright
United States District Court Judge

ORDER ON REPORT AND RECOMMENDATION - 17